ORAL ARGUMENT NOT YET SCHEDULED
BRIEF FOR APPELLANT

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

11-3045

_____

UNITED STATES OF AMERICA,                    Appellee,

        v.

MORRIS B. FAHNBULLEH,                         Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

Barbara E. Kittay, Esquire
Counsel for Appellant
(Appointed by the Court)
D.C. Bar Number 414216

P.O. Box 2458
Kensington, Maryland  20891
(301) 468-1817
bkittay@verizon.net

Crim. No. 09-CR-359 (RBW)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a), appellant, Morris B. Fahnbulleh, hereby states as follows:

A.  Parties and *Amici*:  The parties to this appeal are appellant, Morris B. Fahnbulleh, a consolidated co-defendant, Joe O. Bondo (Case Number 11-3029), and appellee, the United States of America.  There are no intervenors or *amici*.

B.  Rulings Under Review:  This appeal arises from a final judgment of criminal conviction, following jury trial in the United States District Court for the District of Columbia, of violations of 18 U.S.C. §§ 371, 1349, 1341, 1343, 287, and 2.  Appellant argues that the trial court violated the Speedy Trial Act; that it adjudicated the case with jurisdiction or venue; admitted documentary evidence without foundation; sent the case to the jury without sufficient evidence, and misapplied the U.S. Sentencing Guidelines.  Appellant filed a timely notice of appeal on May 10, 2011.

C.  Related Cases:  This matter is on appeal for the first time before this Court.  The only related case is the consolidated co-defendant, *United States v. Joe O. Bondo*, Case Number 11-3029.

# **I N D E X**

                                                              Page

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . 1

THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 9

     I.    Appellant was denied a speedy trial . . . . . . 9

         A.    Procedural Background  . . . . . . . . . 9

         B.    Standard of Review . . . . . . . . . . 12

         C.    Legal Analysis . . . . . . . . . . . . 12

     II.   The district court lacked subject matter
          Jurisdiction and venue  . . . . . . . . . . . 19

         A.    Procedural Background  . . . . . . . . 19

         B.    Standard of Review . . . . . . . . . . 21

         C.    Legal Analysis . . . . . . . . . . . . 21

             1.  Subject matter jurisdiction  . . . . 21

             2.  Venue . . . . . . . . . . . . . . . 23

     III.  The evidence was insufficient . . . . . . . . 29

         A.    Procedural Background  . . . . . . . . 29

         B.    Standard of Review . . . . . . . . . . 31

         C.    Legal Analysis . . . . . . . . . . . . 32

     IV.   The district court improperly calculated
          Appellant's advisory Guidelines range  . . . . 38

         A.    Procedural Background . . . . . . . . . 38

         B.    Standard of Review . . . . . . . . . . 39

```
        C.   Legal Analysis  . . . . . . . . . . . . 39

             1.   The district court erred in
                  applying USSG §2B1.1(b)(1)(I)  . . . 39

             2.   The district court erred in
                  applying USSG §2B1.1(b)(2)(C)  . . . 41

             3.   The district court erred in
                  applying USSG §3B1.2(a). . . . . . . 43

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 44

CERTIFICATE OF COMPLIANCE  . . . . . . . . . . . . . . 45

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . 46
```

**TABLE OF AUTHORITIES**

**CASES**

\* *Apprendi v. New Jersey*, 530 U.S. 466 (2000) . . . . . 42

*Barker v. Wingo*, 407 U.S. 514 (1972) . . . . . . . . . 18

*Gall v. United States*, 552 U.S. 38 (2007) . . . . . . . 39

*Ianelli v. United States*, 420 U.S. 770 (1975) . . . . . 25

*Kentucky v. King,* 131 S. Ct. 1849 (2011) . . . . . . . . 37

*Layne v. Gunter*, 559 F.2d 850 (1st Cir. 1977) . . . . . 17

*Nye & Nissen v. United States*, 336 U.S. 613 (1949) . . . 27

*Pierson v. Winter*, 435 F.3d 319 (D.C. Cir. 2006) . . . . 21

*Pinkerton v. United States,* 328 U.S. 640 (1946). . . 26, 27

\* *Rheuark v. Shaw*, 628 F.2d 297 (5th Cir. 1980) . 17-18, 19

*Smith v. Kansas*, 356 F.2d 654 (10th Cir. 1966) . . . . . 17

*United States v. Bailey*, 444 U.S. 394 (1980) . . . . . . 37

\* *United States v. Booker*, 543 U.S. 220 (2005) . . . . . 42

*United States v. Bowman*, 496 F.3d 685
    (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . 13

*United States v. Childress*, 58 F.3d 693
    (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . 37

*United States v. Fonseca*, 435 F.3d 369
    (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . 12

*United States v. Gatling*, 96 F.3d 1511
    (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . 36

\* *United States v. Haire*, 371 F.3d 833
    (D.C. Cir. 2004). . . . . . . . . . . . . . . . 21, 28

───────────────

\*   **Authorities upon which we chiefly rely are marked with asterisks.**

v

*United States v. Hemphill*, 514 F.3d 1350
     (D.C. Cir. 2008). . . . . . . . . . . . . . . . 12, 13

*United States v. Johnson*, 732 F.2d 379
     (4th Cir. 1984) . . . . . . . . . . . . . . . 17, 18

**\*** *United States v. Lam Kwong-Wah*,
     924 F.2d 298 (D.C. Cir. 1991) . . . . . 21, 25, 26, 36

*United States v. Lucas*, 67 F.3d 956
     (D.C. Cir. 1995). . . . . . . . . . . . . . . . . 31

**\*** *United States v. Manges*, 110 F.3d 1162
     (5th Cir. 1997) . . . . . . . . . . . . . . . . . 25

*United States v. Moore*, 97 F.3d 561 (D.C. Cir. 1996) . . 31

*United States v. Osunde*,
     638 F. Supp. 171 (N.D. Cal. 1986) . . . . . . . . 16

*United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938). . . 27

*United States v. Perez*, 280 F.3d 329
     (3d Cir. 2002). . . . . . . . . . . . . . . . 21, 28

*United States v. Rengifo*, 858 F.2d 800
     (1st Cir. 2007) . . . . . . . . . . . . . . . . . 37

*United States v. Taylor*, 497 F.3d 676
     (D.C. Cir. 2007). . . . . . . . . . . . . . . . . 13

*United States v. Teffera*, 985 F.2d 1082
     (D.C. Cir. 1992). . . . . . . . . . . . . . . . . 32

*Zedner v. United States*, 547 U.S. 489 (2006) . . . . . . 11

## STATUTES AND OTHER REFERENCES

18 U.S.C. § 287 . . . . . . . . . . . . . . . . . . . . . 2
18 U.S.C. § 371 . . . . . . . . . . . . . . . . 1, 35-36
18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . 1
18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . 1-2
18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . 1
18 U.S.C. § 3161-3174 . . . . . . . . . . . . . . . 9, 16
18 U.S.C. § 3161(b) . . . . . . . . . . . . . . . . . . 12
18 U.S.C. § 3161(c)(1) . . . . . . . . . . . . . . . . . 13
18 U.S.C. § 3161(h)(1)(F) . . . . . . . . . . . . . . . 13
18 U.S.C. § 3161(h)(7)(A) . . . . . . . . . . . . . . . 11
18 U.S.C. § 3161(h)(8) . . . . . . . . . . . . . . 9, 10, 13
18 U.S.C. § 3162(a)(1) . . . . . . . . . . . . . . . . . 12
18 U.S.C. § 3162(a)(2) . . . . . . . . . . . . . . . . . 16
18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . 22
18 U.S.C. § 3237 . . . . . . . . . . . . . . . . . . 23-24
18 U.S.C. § 3238 . . . . . . . . . . . . . . . . . . . 24
18 U.S.C. § 3505 . . . . . . . . . . . . . . . . . . . 32
28 U.S.C. § 631 *et seq.* (2000 ed. and Supp. V) . . . . . 10

FRE 803(6) . . . . . . . . . . . . . . . . . . . . . . 33

FRAP 32(a)(7)(B) . . . . . . . . . . . . . . . . . . . 45
FRAP 32(a)(7)(C) . . . . . . . . . . . . . . . . . . . 45

USSG §2B1.1(b)(1)(E) . . . . . . . . . . . . . . . . . 40
USSG §2B1.1(b)(1)(I) . . . . . . . . . . . . . . . 38, 39
USSG §2B1.1(b)(1)(H) . . . . . . . . . . . . . . . . . 40
USSG §2B1.1(b)(2)(C) . . . . . . . . . . . . . . . 38, 41
USSG §3B1.2(a) . . . . . . . . . . . . . . . . . . 38, 43

E.J. Imwinkelried, Evidentiary Foundations
   (2d ed. 1989) . . . . . . . . . . . . . . . . . . . 33

## GLOSSARY

CRRP . . . Community Infrastructure Rehabilitation Project
CRS . . . . . . . . . . . . . . . . Catholic Relief Services
CTS . . . . . . . . . . . . . Commodities Tracking System
STA . . . . . . . . . . . . . . . . . . Speedy Trial Act
USAID . . . . . U.S. Agency for International Development
WV-Int'l . . . . . . . . . . . World Vision International
WV-USA . . . . . . . . . . . . . . . . . World Vision USA
WV-Liberia . . . . . . . . . . . . . . World Vision Liberia

vii

## ISSUES PRESENTED

In the opinion of the appellant, the following issues are presented by this appeal:

I.  Whether the defendant was denied a speedy trial when his transfer from the place of arrest was delayed, where he was held in custody for 155 days before an indictment was returned, where the government did not put forward any reason why it could not proceed with an indictment with evidence it already had obtained from foreign authorities; where the government did not demonstrate that exclusion of this time from the calculation specified in the Speedy Trial Act would be "in the interest of justice [or] outweighs the best interests of the defendant and the public in a speedy trial;" where the original magistrate judge lacked authority to extend the time; and where the second magistrate judge dismissed the charges prior to indictment.

II.  Whether the trial court lacked subject matter jurisdiction and venue where the defendant's company had no privity with the United States; where the events took place exclusively in a foreign country; where the dispute was between two non-governmental entities; where the activities of the company that employed appellant involved the contributions of charitable organizations all over the

world; and where layered financial transactions of funds
that ultimately were intended to send U.S. foreign aid to
Liberia rendered the funds no longer U.S. property and had,
at a minimum, changed and concealed the character of the
funds such that no reasonable person could have any longer
considered them U.S. property, and where, at worst,
appellant and others would have believed that the food and
commodities they disbursed were donated by Catholic Relief
Services.

III.  Whether the trial court properly admitted
documents the government proffered as business records,
where no witness properly authenticated the documents or
provided any evidence of who created them (much less
whether they had any duty to be truthful or accurate), of
where or how they were stored, of the circumstances and
manner of their retrieval, or whether the search for
records was reliably thorough and complete, or in any
respect ensured that the content of the documents was
reliable.

IV.  Whether the evidence of conspiracy or fraud was
sufficient, where the commodities the defendant managed
were not property of the United States, the defendant could
not have believed they were any longer the property of the
United States or that the U.S. mails or wire communications

would be used in connection with his activities, and where the jury did not find that any food, building supplies, or funds had been diverted by or for the benefit of the defendants.

V.  Whether the trial court erred at sentencing, in applying a 16-level enhancement for "loss" under U.S.S.G. §2B1.1(b)(1)(I), where the defendant did not concede this amount and where the jury did not find that the defendant diverted funds or resources, and where the total amount of this specific U.S. foreign aid program to Liberia, which transferred through no less than three non-government independent organizations, all of which accepted overhead and commission, was a gross overstatement of loss alleged to be caused by the defendant's activities.

VI.  Whether the trial court erred at sentencing in applying a 6-level enhancement because the offense "involved 250 or more victims," under U.S.S.G. §2B1.1(b)(2)(C), where the defendant did not concede these facts, the government did not prove these facts, and the evidence supporting the enhancement was unreliable.

VII.  Whether the trial court erred at sentencing in applying a 4-level adjustment for "organizer or leader" based on appellant's position with his company, but not on any proven "role in the offense."

## <u>STATUTES AND REGULATIONS</u>

Pursuant to D.C. Circuit Rule 28(a)(5), appellant notes that the following statutes and regulations are pertinent to this appeal:

<u>Criminal Offenses</u>:
18 U.S.C. § 287
18 U.S.C. § 371
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1349

<u>The Speedy Trial Act</u>
18 U.S.C. § 3161-3174
18 U.S.C. § 3161(b)
18 U.S.C. § 3161(h)(1)(F)
18 U.S.C. § 3161(h)(7)(A)
18 U.S.C. § 3161(h)(8)
18 U.S.C. § 3162(a)(1)
18 U.S.C. § 3162(a)(2)

<u>Jurisdiction and Venue</u>
18 U.S.C. § 3231
18 U.S.C. §3237
18 U.S.C. § 3238
28 U.S.C. § 631, *et seq.*

<u>Sentencing Guidelines</u>
USSG §2B1.1(b)(1)(E), (H), (I)
USSG §2B1.1(b)(2)(C)
USSG §3B1.1

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

**No. 11-3045**

———————————————

UNITED STATES OF AMERICA,                                        Appellee,

       **v.**

MORRIS B. FAHNBULLEH,                                        Appellant.

———————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————

**BRIEF FOR APPELLANT**

———————————————

**STATEMENT OF THE CASE**

On December 18, 2009, appellant, Morris B. Fahnbulleh,
and two other Liberian citizens[1] were charged by indictment
with one count of conspiracy to defraud the United States,
in violation of 18 U.S.C. § 371; one count of conspiracy to
commit mail and wire fraud, in violation of 18 U.S.C.
§ 1349; four counts of mail fraud, in violation of 18
U.S.C. § 1341; two counts of wire fraud, in violation of 18

———————————————

[1]   The indictment charged two additional individuals:
(1) Thomas M. Parker, who to date, remains at large; and
(2) Joe O. Bondo, who was tried together with appellant in
the district court, and whose appeal is consolidated here.
*See United States v. Joe O. Bondo*, U.S.C.A. Case No. 11-
3047.  Two additional counts of the indictment charged
Mr. Bondo only, with witness tampering.

U.S.C. § 1343; and four counts of submitting false claims, in violation of 18 U.S.C, § 287 (App. 48).[2]

Testimony in the trial before the Honorable Reggie B. Walton and a jury commenced on October 20, 2010, and continued until the case was submitted to the jury, on November 10, 2010.  On November 16, 2010, the jury found the defendant guilty on counts 1-8, and 11-14.

On April 26, 2011, Judge Walton sentenced the defendant to a total of 142 months' imprisonment:  142 months on Count 2; and 60 months on each of Counts 1, 3-6, 7-8, and 11-14, all to run concurrently.  The court also imposed a three-year term of supervised release on each count (all to be served concurrently) and ordered the defendant to pay a $1200 special assessment and restitution totaling $1.2 million (App. 64-70).

Appellant noted his appeal on May 10, 2011 (App. 71).

## THE TRIAL

In 2005, the United States Agency for International Development ("USAID"), provided a grant of $1.9 million to

---

[2]  "App" refers to the appendix submitted with this brief. With respect to the transcripts of the proceedings, we note that, some intervening trial transcripts were not included in the continuous pagination of the trial; therefore, transcripts will be identified by the continuous pagination of the trial ("Tr."), unless otherwise noted by specific date.

Catholic Relief Services ("CRS"), for the purpose of
extending humanitarian assistance to the citizens of the
West African nation of Liberia, a country ravaged by civil
war (Tr. 82, 143, 387, 550). Although CRS accepts grants
from the United States, it does not actually provide the
assistance; instead, it gives to "consortium partners,"
throughout the world, who perform the disbursement of food
and the other commodities needed by the recipient countries
(Tr. 81).

In this case, CRS issued a $1.24 million subgrant to
World Vision (Tr. 387), a Christian organization with
loosely affiliated chapters, including World Vision USA
("WV-USA") a company that lobbies the U.S. government,
soliciting grant money and entering into contracts that,
with respect to foreign countries, it then assigns to World
Vision International ("WV-Int'l"), which in turn transfers
responsibility to small local chapters, such as World
Vision Liberia ("WV-Liberia") (Tr. 165, 282, 304). WV-
Liberia is independent, but it can seek administrative
support services, at times, from WV-Int'l (located in
Monrovia, California) (Tr. 243), and WV-USA (located in the
state of Washington).

Angelique Crumbly, USAID Director of Policy, Budget
and Performance, testified that on March 9, 2005, the USAID

granted $1.9 million to CRS, calling the project the Community Infrastructure Rehabilitation Project ("CRRP") (Tr. 550). The award period commenced January 25, 2005 (Tr. 550), and according to Crumbly, expenses incurred prior to that date would <u>not</u> be reimbursed (Tr. 547-48, 566). Only CRS (not World Vision) was responsible to submit the claims, on Standard Form (SF) 269, and any supporting documentation (Tr. 556, 562).

Lisa Mondori, an attorney with WV-Int'l, testified WV-Liberia was <u>not</u> in privity with USAID, and had no reporting requirements to USAID (Tr. 352-53). WV-Liberia had a system that tracked the distribution of food and other commodities that it used for all of its grants (*id.*). Information from these records was entered into what was called the Commodities Tracking System ("CTS"), and was used here, to generate reports to CRS.[3]

Eric Fullilove, Acting Chief Financial Officer of WV-Int'l, which is located in California, was asked to

---

[3]    Mondori was not an employee of WV-Liberia; nevertheless, she was allowed to present personnel records that she claimed reflected appellant's positions with WV-Liberia, during the period of his employment from January 2005 to December 2006 (Tr. 350, 367); and that co-defendant Bondo was a food monitor and commodities officer (*id.* at 351). She was not asked about defendant Parker, but employees later testified that he reported to appellant (Tr. 1050, had an office near appellant's (Tr. 807), and also worked as a field supervisor, alongside Bondo (*id.* at 581).

authenticate and describe the CTS documents that he said were retrieved from storage in Liberia, after WV-Liberia shut down (Tr. 241-43, 253-65). Using these records, the government presented the testimony of five former employees of WV-Liberia, many of whom testified that they falsified some of the records (Tr. 731, 815, 1031, 1077, 1328-29),[4] and committed other wrongdoing, including: 1) the diversion of construction materials to the personal residences of Parker and Bondo (Tr. 697), and property that others claimed belonged to appellant; 2) the use of working hours for repairs and construction at those personal residences (Tr. 697); and 3) the repair of existing wells and latrine structures with limited construction materials, while reports were generated of new wells and latrines, using more abundant time and materials (Tr. 594).

Not one former employee testified (or ever told the principal government investigator (Tr. 1787)), that appellant directed them to create records, divert

---

[4]    The former employees testified that Bondo directed them to invent the names of food recipients, and to use all of their fingers to simulate their fingerprints (*see, e.g.,* Tr. 1035, 1326). An FBI fingerprint expert testified that three documents bore fingerprints that matched the known prints of defendant Bondo (Tr. 1734). The expert did not provide any evidence that would have even tended to corroborate the claims of the former employees that they used five fingers to simulate the fingerprints of food recipients –– an allegation the government repeatedly stressed but apparently made no effort to corroborate.

materials, or perform any construction at his property. Appellant's only connection to the records was that he twice told employees that they should be "careful" not to get caught by auditors (Tr. 1046-47, 1080), and the location of their work table, which was down the hall from the door to appellant's office (Tr. 1078-79, 1332-36).

The defendants did not testify. Appellant presented the testimony of two neighbors (father and son), to establish that the son (not WV employees) dug the well outside appellant's home (Tr. 1696, 1705). Through cross-examination and with the testimony of a co-worker, appellant tried to show the government's evidence, if anything, pertained to an earlier contract with CRS, and not the CRRP, as charged in the indictment (*see, e.g.,* Tr. 601, 784, 1402, 1575).

## SUMMARY OF THE ARGUMENT

The defendant was denied a speedy trial because he was held in custody for 155 days before an indictment was returned (including an extended delay of 28 days, before his initial transfer from New York). The government claimed that it was awaiting foreign documents, but the time granted by the magistrate (who was without authority to extend the time for indictment), in any event, had run,

and the government (1) had not filed a motion to further extend the time; (2) did not explain why it could not proceed with evidence it already had obtained from foreign authorities; and (3) did not demonstrate that exclusion of this time from the calculation specified in the Speedy Trial Act would be "in the interest of justice [or] outweighs the best interests of the defendant and the public in a speedy trial." The magistrate judge properly dismissed the charges prior to indictment; the trial court erred in reinstating the case, post-indictment.

The trial court lacked subject matter jurisdiction and venue because the defendant's company had no privity with the United States (the dispute was between two non-governmental entities), the events of the case took place in Liberia, and appellant had no contractual or sub-contractual agreement with the United States or any of its agencies. The layered financial transactions of funds that ultimately were intended to send U.S. foreign aid to Liberia, rendered the funds no longer U.S. property and had, at a minimum, changed and concealed the character of the funds such that no reasonable person could have any longer considered them U.S. property. Appellant reasonably could and did believe that the food and commodities his

company had disbursed were donated by Catholic Relief Services.

The trial court improperly admitted documents the government proffered as business records, because no witness properly authenticated them or demonstrated reliability.  The evidence of conspiracy was insufficient because was no evidence of agreement; moreover, intent to defraud the United States was not proven, because the property in question was not U.S. property, and no one could have anticipated or intended that the U.S. mails or wire communications would be used.

The trial court erred at sentencing:  (1) in applying a 16-level enhancement for "loss" under U.S.S.G. §2B1.1(b)(1)(I), because appellant did not concede this amount, the jury did not find any diversion of funds or resources, and the total amount of U.S. foreign aid to Liberia, which transferred through no less than three non-government independent organizations, all of which accepted overhead and commission, was a gross overstatement of loss alleged to be caused by the defendant's activities; (2) in applying a 6-level enhancement because the offense "involved 250 or more victims," under U.S.S.G. §2B1.1(b)(2)(C), because appellant did not concede this number, the government did not prove it, and the evidence

supporting the enhancement was unreliable; and (3) in applying a 4-level adjustment for "organizer or leader" based on appellant's position with his company, but not on any proven "role in the offense."

Appellant also respectfully requests to join in any arguments made by co-appellant Bondo that may reasonably also pertain to his appeal, as well.

<strong><u>ARGUMENT</u></strong>

**I.    <u>Appellant was denied a speedy trial.</u>**

**A.    Procedural Background**

The government filed an initial complaint and arrest warrant on May 18, 2009, pursuant to which appellant was arrested on July 15, 2009, in the Southern District of New York.  He was not presented for an initial appearance in the District of Columbia for 27 days, appearing before the Magistrate Judge August 11, 2009.[5]

At the time of his initial appearance, the government requested excludable time under the Speedy Trial Act of 1974 (hereinafter referred to as the "Speedy Trial Act" or "STA"), 18 U.S.C. §§ 3161-3174, based on a request for

---

[5]    As set forth more fully, *infra*, the district court found only five days of this delay reasonable, holding the remaining 22 days to constitute inexcusable delay (Mem. Op. dated October 7, 2010, at 14 (Walton, J.) (hereafter "Walton Opinion:); App. 97.

foreign evidence that, at the time of the appearance, had been outstanding for seven (7) months.  *See* § 3161(h)(8). The magistrate judge denied the government's request for a full year extension, granting only until October 16, 2009, for the timely return of an indictment (8/14/09 Tr. 65-66).[6]

On October 15, 2009, the government filed a status report detailing the original date and manner of its international request for assistance, advising the court that no documents had been received (App. 107).  It did not explain what additional evidence it was expecting or why an indictment could not proceed in anticipation of the additional materials (App. 107-08).  Most significantly, it did *not* file a motion to extend the time, until *after* the time had expired (*see* 10/16/09 Tr. 14-15; Gov't Mot. to Exclude Certain Time from STA Calculation, filed October 19, 2006, App. 105-09).

The magistrate judge, while conceding that "the determination of what evidence will be presented to a grand jury is entirely a matter of prosecutorial discretion and not reviewable" by her, nevertheless concluded:

> [I]n the absence of representations –
> *ex parte* or otherwise – regarding the

---

[6]    Appellant does not concede that Magistrate Kay had the authority, under the Federal Magistrates Act, 28 U.S.C. §631, *et seq.* (2000 ed. and Supp. V), to grant any extension of time, under STA.

> need for the evidence now in the
> Republic of Liberia, the [court] has no
> means by which to make a finding that
> the proposed exclusion of time in which
> an indictment must be filed is in the
> interest of justice, and outweighs the
> best interests of the Defendant and the
> public in a speedy trial.

Mem. Opinion dated December 16, 2009, at 11, n.8 (Robinson,

M.J.) (hereafter "Robinson Opinion"); App. at 72, 82.

Reviewing *de novo* the defendant's objections to the

pre-indictment delay, the district court was satisfied that

129 days could be excluded under §3161(h)(8) -- the entire

time period beginning on the date of the defendant's first

appearance in the District of Columbia up to and including

the date of indictment -- merely upon finding that the

government had submitted an official international request

for records; that the records "unquestionably would be

located in Liberia;" and that officials in Liberia were

working on a response.  *See* Walton Opinion at 20; App. At

103.  No examination was made of whether that enormous

delay was "in the interest of justice and would outweigh

the best interests of the defendant and the public in a

speedy trial."  *See* 18 U.S.C. §3161(h)(7)(A); *Zedner v.*

*United States*, 547 U.S. 489, 501 (2006).  No examination

was made of the evidence already in the government's

possession.  No examination was made into whether the

extreme length of the delay was necessary.  No examination
was made of the prejudice to the defendant.

     In addition, appellant complains that following his
conviction, he was further denied due process, when the
district court failed to produce trial transcripts for over
a year from the filing of his notice of appeal.

### B.    Standard of Review

     Review of a district court's legal determinations
under the Speedy Trial Act is made *de novo*.  *United States
v. Hemphill*, 514 F.3d 1350, 1356 (D.C. Cir. 2008), *citing
United States v. Fonseca*, 435 F.3d 369, 371 (D.C. Cir.
2006).

### C.    Legal Analysis

     The Speedy Trial Act directs that an indictment "shall
be filed within thirty days" from the date of arrest" 18
U.S.C. §3161(b).  Although the STA sets forth circumstances
for the exclusion of periods of delay, as set forth below,
the sanction for violation of the 30-day limit is that the
"charge against that individual contained in [the]
complaint shall be dismissed or otherwise dropped" 18
U.S.C. §3162(a)(1) (emphasis added), and the government is
barred from filing an indictment charging the defendant
with the same crimes that had been alleged in the criminal

- 12 -

complaint.  *See United States v. Bowman*, 496 F.3d 685, 688 (D.C. Cir. 2007).[7]

Here, the only pertinent circumstances under which the pre-indictment time period could have been extended is set forth in §3161(h)(8):

> Any period of delay, not to exceed one year, ordered by a district court upon an application of a party and a finding by a preponderance of the evidence that an official request … has been made for evidence of any such offense and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

*See* 18 U.S.C. §3161(h)(8).[8]  Thus, a court can grant delay *not to exceed* one year, but certainly may grant less, as it did here, where the magistrate granted time only through October 16, 2009, despite the government's request for the full one-year. *See* 8/14/09 Tr. 65-66.

---

[7]   The rules are to be strictly applied:  for example, the STA provides that trial shall commence within 70 days of indictment (*see* § 3161(c)(1)), a rule that is violated when, without a trial, 'dawn breaks on the [next] day' after the Speedy Trial period ends." *United States v. Hemphill*, 514 F.3d at 1356, *quoting United States v. Taylor*, 497 F.3d 676, 677 n.4 (D.C. Cir. 2007).

[8]   Also pertinent here, but not specifically in contention because of the trial court's ruling in appellant's favor, is §3161(h)(1)(F), which excludes "delay resulting from transportation of any defendant from another district," which in this case inexplicably consumed 27 days, only ten of which the statute presumes reasonable, and only five of which the district court, here, found reasonable and excludable.  *See* Walton Opinion at 14; App. 97.

- 13 -

Having made no effort to examine the length of time justified in these particular circumstances, the district court appears to have presumed that any length of time up to a year is permissible. But the statute does not grant a one-year extension, it grants an extension "*not to exceed one year,*" suggesting that judgment must be applied to the individual circumstances, to determine that which is reasonable and which balances the competing public interests. Here, the magistrate considering the government's original request granted until October 16, 2009. Indeed, by that time, as the government conceded in its status report dated October 15, 2009, its request to Liberia had been outstanding for ten months, and some documents had been received. It was perfectly reasonable for the reviewing magistrate to require a factual basis for further extension, sufficient to apply the balancing test contemplated by the Speedy Trial Act.

In contrast, the district court undertook no such review. Under the district court's analysis, it appears that any length of time, so long as it does not exceed one year, requires no further examination, once it is satisfied that an international request exists. Surely this is insufficient: it not only then hands over full discretion of diligence to the government, far worse than that -- it

shifts that burden of diligence to foreign bureaucrats, in distant countries, who have no reason to appreciate, respect or honor the rights and of detained individuals awaiting justice in U.S. courts.  The logic applied by the district court permits the government to file a foreign request, arrest an individual upon probable cause, and hold him for up to a year before indictment, even where sufficient essential evidence has been received.

In contrast, the magistrate judge requested that the government demonstrate why the evidence set forth in the affidavit in support of the arrest warrant, combined with evidence already received from Liberia, could not have formed the basis for indictment -- not so that she could direct the progress of the prosecution, but rather, so that she could determine whether "exclusion [of additional time] would be in the interest of justice and would outweigh the best interests of the Defendant and the public in a speedy trial" (Robinson Opinion at 10; App. 81).

Pre-indictment dismissal, here, where on the date of the indictment, the defendant remained in custody for over five months and the government's foreign request had been outstanding for over eleven months, should have been with prejudice.

> In determining whether to dismiss the
> case with or without prejudice, the
> court shall consider, among others,
> each of the following factors:  the
> seriousness of the offense; the facts
> and circumstances of the case which led
> to the dismissal; and the impact of a
> reprosecution on the administration of
> [the STA] and on the administration of
> justice.

18 U.S.C. §3162(a)(2).  Although a disturbing fraud case,

perhaps, this case is not "serious" in a manner that

suggests ongoing danger to the community.  The alleged

activities -- none of which involved violence or physical

harm to any individual (*see, e.g., United States v. Osunde,*

638 F. Supp 171 (N.D. Cal. 1986)) -- were long since

concluded.  What harms may have occurred also had been

remedied by the large companies involved in the dispute, so

the government could not claim that dismissal would impact

the administration of justice; the institutional

participants had provided restitution and were pursuing

various other civil, criminal, and administrative remedies

against others.

On the other hand, appellant suffered precisely the

harm and prejudice that the STA is designed to avoid:  the

government delayed his transfer from New York for a month,

completely without explanation or justification, during

which time he had no communication with his trial counsel

or potential witnesses, so that he could begin to prepare

his defense and, as the defendant advised the court (in his

pre-trial *pro* se motion to dismiss the indictment), he

suffered the loss of employment and financial resources;

inability to contact counsel and potential witnesses;

fading memories and the loss of exculpatory evidence; and

the anxiety, physical illness and humiliation associated

with prolonged detention.  *See* Defendant's *Pro Se* Motion to

Dismiss Indictment with Prejudice for Speedy Trial Act

Violation at 29, Docket Entry #110; App. 115.  The balance

of this prejudice against the government's alleged need to

await additional foreign evidence was not considered or

addressed by the district court.

The delay was exacerbated, when appellant waited a

year from the filing of his notice of appeal, until receipt

of trial transcripts.  *See United States v. Johnson*, 732

F.2d 379, 383 (4th Cir. 1984) (two-year delay in producing

trial transcript), *citing Rheuark v. Shaw*, 628 F.2d 297

(5th Cir. 1980) (same).[9]  *Johnson* and *Rheuark* each hold that

a delay in producing trial transcripts for appeal *may* be a

denial of due process, depending on four factors:

---

[9]   *See also Layne v. Gunter*, 559 F.2d 850, 851 (1st Cir.
1977)(three-year delay); *Smith v. Kansas*, 356 F.2d 654, 657
(10th Cir. 1966)(one-year delay).

"'[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" *See Johnson*, 732 F.2d at 382; *Rheuark*, 628 F.2d at 303; *both quoting Barker v. Wingo*, 407 U.S. 514 (1972).

With respect to appellate delay, *Rheuark* identified three specific concerns:

> (1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired. …
> [P]rejudice to a defendant is clearly present when, after a substantial delay in awaiting an appeal, his conviction is reversed and the state is allowed to retry him, since during the delay witnesses or other evidence may no longer be available.

*Rheuark v. Shaw, supra*, 628 F.2d at 303, n.8.

Prejudice is significant, here, given appellant's continuous custody of nearly three years:  27 days from arrest to initial appearance, 155 days from arrest to indictment, and nearly a year before appellate counsel could even begin to review the trial transcripts.  The indictment alleges a conspiracy dating back to April 2005 (more than seven years ago) and events on another

continent.  Were this case to be re-tried, it would be nearly impossible to reconstruct a defense after a period of time that would by then be significantly longer than seven years.  The *Rheuark* court observed that, "a consideration of the Sixth Amendment speedy trial right in its most pristine sense would be triggered by any retrial of such a person."  *Id.*

Taking into consideration the repeated delay in appellant's prosecution, and the near impossibility of fairness in any retrial, appellant requests more than mere reversal of this conviction, appellant believes that the interests of justice require dismissal with prejudice.

## II.  The district court lacked subject matter jurisdiction and venue

### A.  Procedural Background

Pre-trial, appellant requested and was granted leave to represent himself *pro se*, and he moved orally and in writing for dismissal, for lack of venue and subject matter jurisdiction.  By Order dated October 6, 2010 (*see* App. 120-23), the trial court denied the motion:

> Section 3231 plainly states that this Court "shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States," and here, the crimes alleged in the indictment are indeed "offenses against

> the laws of the United States" that
> purportedly took place, at least in
> part, within the territory of the
> United States.

Order dated October 6, 2010, at 2; App. 121.  The specific

allegations cited by the trial court all pertain to overt

acts of the conspiracy involving communications between CRS

and USAID and claims transmitted from CRS employees in

Maryland to USAID offices in Washington, D.C.  No co-

conspirator or employee of WV-Liberia ever performed an

activity of any kind in the United States.

    With respect to venue, the trial court held that the

indictment alleged sufficient venue, holding that "[v]enue

is proper on the conspiracy counts … because the indictment

charges the defendant, *inter alia*, with committing overt

acts within the District of Columbia," *id*. at 3; App. 122.

Also, it held that venue was "proper for the mail and wire

fraud counts because the grand jury alleges that the

defendant 'knowingly caused to be delivered in the United

States Postal Service … false and fictitious reports … to

[USAID in] Washington, D.C." *Id*.  The court declined to

give a jury instruction on venue, holding:

> [T]here's nothing from the face of the
> indictment that raises an issue
> regarding venue.  And there's nothing
> that's been presented during this trial
> either through cross-examination during
> the government's case or through the

- 20 -

> presentation of the defense case that
> raises … a genuine issue, of dispute
> about the issue of venue.  So it's my
> reading of [*United States v. Perez*, 280
> F.3d 329, 334 (3d Cir. 2002)] that
> absent that showing there is no
> entitlement to a venue instruction.

(Tr. 1970).  The court did not address venue with respect

to the substantive charges of false claims, mail fraud, or

wire fraud.

### B.    Standard of Review

This court reviews *de novo* a district court's ruling

on subject matter jurisdiction.  *See Piersall v. Winter*,

435 F.3d 319 (D.C. Cir. 2006).  In cases where venue and

sufficiency of the evidence are indistinguishable issues,

the court reviews the evidence in the light most favorable

to the Government, to determine whether the government has

proven venue by a preponderance of evidence.  *See United*

*States v. Haire*, 371 F.3d 833, 837 (D.C. Cir. 2004), *citing*

*United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C.

Cir. 1991).

### C.    Legal Analysis

#### 1.   Subject matter jurisdiction

Appellant worked for a Liberian company that accepted

donations from various charitable organizations in the

United States and elsewhere (Tr. 350, 367).  The funds it

received for the program it called "CRRP" were funds
provided and disbursed –- not by the United States –- but
by CRS, a non-governmental organization with offices and
employees resident in Liberia.  It is undisputed that WV-
Liberia had no privity with the United States (Tr. 352-53)
and also, that both CRS and USAID had auditors and
inspectors in Liberia who were responsible for contract
compliance (Tr. 983, 1594).  If WV-Liberia employees
committed a crime -- and appellant does not concede they
did -- it was against CRS, *not* against the United States.
Of course, disputes between private companies, most
particularly those committed overseas, do not provide a
basis for subject matter jurisdiction, even where fraud is
alleged.  *See* 18 U.S.C. § 3231.

The United States (USAID) cannot claim that it was
targeted here, where it purposefully constructed the legal
separation of responsibility for this program.  It
presumably garners a legal benefit from this relinquishment
of responsibility for food distribution to CRS, and from
CRS to international companies, and from those companies to
their distant local partners, the practical result of which
is a business structure that separates the United States
from funds and commodities that previously were its

- 22 -

property.[10]  Moreover, the absence of privity with the
United States, coupled with CRS acceptance of
responsibility for contract oversight and its own contract
compliance, suggests that the Liberian employees of a
Liberian company, who never leave Liberia and who never
communicate with U.S. government employees or agencies, are
not committing, contemplating or intending to commit crimes
against the United States, much less conspiring or scheming
to do so.  Moreover, they could not believe that activities
that satisfy obligations to *CRS* (acts performed entirely in
Liberia, subject to CRS oversight in Liberia), could use or
"cause" the use of U.S. mail or wire facilities.

### 2.  Venue

The district court ruled that venue was proper because
the defendants caused others to act within the District of
Columbia, even though not one co-conspirator ever stepped
foot here.  Pursuant to 18 U.S.C. §3237:

> [A]ny offense against the United States
> begun in one district and completed in

---

[10]    The layering of responsibility for the project makes
all the more outrageous the government's remarks, in
closing argument, that WV-Liberia employees -- layers
further and further into the process -- were "U.S.-salaried
employees" (11/9 Tr. 81, 86).  More than mere oratory, this
plain falsehood could only have been intended to inflame
the jury, much like the government's improper references to
the loss of "taxpayer dollars" (11/9 Tr. 111) that prompted
a curative instruction (11/10 Tr. 114).

> another, or committed in more than one
> district, may be inquired of and
> prosecuted in any district in which
> such offense was begun, continued, or
> completed.

18 U.S.C. 3237(a).  Here, any acts committed in the

District of Columbia were *not* committed by co-conspirators,

but could only constitute innocent acts of U.S. government

employees, paying claims submitted by CRS.  *Id.*

    The trial court's analysis more properly should have

considered 18 U.S.C. §3238, which states that:

> The trial of all offenses begun or
> committed upon the high seas, or
> elsewhere out of the jurisdiction of
> any particular State or district, shall
> be in the district in which the
> offender, or any one of two or more
> joint offenders, is arrested or is
> first brought; but if such offender or
> offenders are not so arrested or
> brought into any district, an
> indictment, or information may be filed
> in the district of the last known
> residence of the offender or of any one
> of two or more joint offenders, or if
> no such residence is known the
> indictment or information may be filed
> in the District of Columbia.

18 U.S.C. §3238.  This is not the analysis that the trial

court applied here, which also would <u>not</u> have permitted

venue in D.C., because appellant was arrested in the

Southern District of New York and his co-defendant was

arrested in the District of Maryland (Tr. 1005).

Appellant requested in a timely manner, several times, that the trial court instruct the jury of its obligation to find, specifically, that the government had proven venue (10/26 Tr. 9; 11/4 Tr. 1845). The trial court admitted that it mistakenly only considered the issue of a venue instruction in relation to the conspiracy charge (11/10 Tr. 174), but even with respect to the conspiracy charge, venue was insufficient. Any acts committed in the United States were innocent requests or completion of payments, and although an overt act can be innocent (*Iannelli v. United States*, 420 U.S. 770, 785 (1975)), it still must be committed by a co-conspirator (*United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991)).

> The statute … explicitly provides that for the crime of conspiracy to be complete, one or more of the co-conspirators must have performed an overt act to bring about the object of the conspiracy. This language cannot be stretched to include the posting of a letter by a non-conspirator.

*United States v. Manges*, 110 F.3d 1162, 1170 (5th Cir. 1997)(act of a non-conspirator could not constitute an overt act and therefore could not extend the statute of limitation).

But the even more serious defect concerns the substantive charges, because venue was clearly lacking with

- 25 -

respect the false claims, mail fraud and wire fraud charges contained in Counts 11 through 14.  With respect to non-conspiracy offenses, this court requires more direct intention to enter a venue:

> If the government wishes to establish venue for an … in a district where the defendant did nothing, but where the defendant's confederates committed criminal acts, it is required to argue and prove that the defendant specifically aided and abetted those acts and to request that the jury be instructed on the issue.  Because the government failed to advance any such argument or proof or to obtain a proper jury instruction, we reverse [the conviction].

*United States v. Lam Kwong-Wah*, 924 F.2d at 302 (attempted drug distribution).  The government did not request, here, and the court did not give, an aiding and abetting instruction, here, charging only that the defendant "knowingly caused" a claim to be made (11/10 Tr. 161), and then, further confusing the issue of venue (particularly where no co-conspirator ever left the territorial boundaries of Liberia) with the recitation of a "Pinkerton" instruction,[11] immediately following the elements of false claims:

> As I indicated earlier, a conspiracy is a kind of partnership in crime and its members may be responsible for each

---

[11]    *See Pinkerton v. United States*, 328 U.S. 640 (1946).

others' actions. A defendant is responsible for an offense committed by another member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, and a natural consequence of, the conspiracy.

11/10 Tr. 163. *Pinkerton* liability and accomplice liability differ significantly because, among other things, aiding and abetting requires proof that the defendant "*intentionally* participated" in the principal's crime:

> The rule of [*Pinkerton*] does service where the conspiracy was one to commit offenses of the character described in the substantive counts. Aiding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy. And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. *Pinkerton* … is narrow in its scope. Aiding and abetting rests on a broader base; it states a rule of criminal responsibility for acts which one assists another in performing.

*Nye & Nissen v. United States*, 336 U.S. 613, 620 (1949), citing *United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938).

But with respect to venue, the government cannot rely on a *Pinkerton* theory; rather, the jury must find that the defendant consciously shared in the specific criminal act. The defendant was entitled, therefore, even if only with respect to the substantive charges to a jury instruction on

- 27 -

venue. This court has held that "where there is no facially-obvious defect in the allegations of venue," the trial court must specifically instruct the jury on venue, where three conditions are met:

> "(1) the defendant objects to venue
> prior to or at the close of the
> prosecution's case-in-chief; (2) there
> is a genuine issue of material fact
> with regard to proper venue, and
> (3) the defendant timely requests a
> jury instruction."

*United States v. Haire*, 371 F.3d at 840, *quoting United States v. Perez*, 280 F.3d 329, 334 (3d Cir. 2002). These conditions were met, here: it is beyond cavil that this defendant, when he was arguing on his own behalf *pro se* and through counsel, strenuously did (and continues to) object to venue; moreover, the trial judge stated no basis for venue, throughout the proceedings below, other than appellant caused others to commit acts in the District of Columbia; and finally, appellant did indeed request a jury instruction (10/26 Tr. 9). Appellant asserts, therefore, that the trial court's refusal to dismiss the indictment for lack of venue was error, and its refusal to include an instruction on venue was error.

III. **The evidence was insufficient**

A.    **Procedural Background**

The record is replete with testimony that Parker and
Bondo instructed employees to falsify records and to
perform construction labor at their personal residences
during working hours;[12] however, with respect to appellant,
a most generous summary of the evidence is no more than:

> (1) that a table occupied by employees when they were
> creating false records was down the hall from his
> office (Tr. 1078-79, 1332, 1336);
>
> (2) that he *never* directed employees to falsify
> records (Tr. 1787); but he told them to be careful not
> to be seen (Tr. 1046-47, 1080, 1330);
>
> (3) that he once told an employee "the others are
> helping me; why aren't you?" with no particular
> reference to what "helping" meant or whether it was

---

[12]    We note that even with respect to Messrs. Parker and
Bondo, let alone with respect to appellant, there is not
one word of testimony about food commodities being
diverted, or demonstrating that the alleged co-conspirators
did anything other than create documents with fictional,
rather than the real recipients of food distribution.  It
certainly is not unimaginable that individuals unschooled
in the niceties of Western civilization business methods,
might perform first and do the paperwork later.  Indeed,
while the jury found that records had been falsely created,
it expressly did not find that conspirators had diverted
food and construction materials, declining to find that the
defendants had committed overt acts (a) (the diversion of
food "to be sold for cash at local markets"); (b) (the
division of the proceeds of such sales), or (c) (the
diversion of construction materials purchased for the CRRP)
(App. 55-56, 129).  Another explanation, to which
government witnesses admitted, was that commodities were
sometimes stolen by people "in the community" (Tr. 824).

work-related (Tr. 1523), and that he may have asked him to dig a well (Tr. 1528);

(4) that an employee got sand at a beach and took it to appellant's house (Tr. 1343, 1413);

(5) that he told an employee that if he told auditors that he had repaired old wells, rather than digging new ones, he might lose his job (Tr. 1500, 1502); and

(6) that an employee claimed to have dug a well on appellant's property (Tr. 1602), (but defense witnesses claimed it was a neighbor who dug the well (Tr. 1696), and that it was a public well (Tr. 1705)).

This is the quantum of evidence against appellant, other than the testimony of the investigating agent, that she "assumed" appellant was part of the wrongdoing, simply based on his position in the company (Tr. 1790).

Ruling on appellant's motions for judgment of acquittal (MJOA),[13] the trial court held:

> You've got witnesses who say that [appellant] was saying things to them that clearly indicated that he appreciated what they were doing and told them that they should do it discretely so it would not be detected. I think, by inference, circumstantially that is clearly sufficient evidence to show that he was a part of this overall scheme to falsify this information in order to pilferage it for his own purposes and those of other members of the conspiracy.
> * * *

---

[13]    Due to logistical issues relating to the presentation of defense testimony remotely, from the U.S. Embassy in Liberia, the Court agreed to hear all of the defendants' MJOAs at the conclusion of all of the evidence.

- 30 -

> I think the evidence is sufficient
> circumstantially to indicate that
> [appellant] was, in fact, a part of a
> conspiracy. I think there clearly is
> evidence that there was a concerted
> effort taking place within World Vision
> Liberia to falsify information
> regarding commodities and also
> information related to other activity
> of employees of World Vision who were
> supposed to be providing services and
> products to people in need in the
> country, and that rather than that
> occurring, those items were being, in
> some way, used for the benefit of
> [appellant]. Admittedly, there is no
> specific evidence in the record showing
> that money was in some way ending up in
> his possession as a result of the
> products not going to who they were
> supposed to go. But I think, again, by
> inference, one could infer that … there
> was a benefit he was acquiring … based
> upon the fact that purportedly
> employees who were supposed to be doing
> work for the people of Liberia were
> doing it … for the personal benefit of
> [appellant], so I think the evidence
> circumstantially is sufficient to
> support all the claims that have been
> filed against him in the indictment.

(11/9 Tr. 49, 51-52; App. 124-32).

### B.    Standard of Review

Reviewing the sufficiency of evidence, this court
reviews the evidence *de novo*, in the light most favorable
to the government, *United States v. (Cory) Moore*, 97 F.3d
561, 563-64 (D.C. Cir. 1996), *citing United States v.
Lucas*, 67 F.3d 956, 959 (D.C. Cir. 1995), drawing no

- 31 -

distinction between direct and circumstantial evidence, *id., citing United States v. Teffera*, 985 F.2d 1082, 1085 (D.C. Cir. 1993).

### C.   Legal Analysis

The corpus of the government's evidence were "36 binders" of documents that the government claimed were WV-Liberia business records, offered through the testimony of a "summary witness," Eric Fullilove, the Acting Chief Financial Officer of WV-Int'l, located in California (Tr. 241-43, 266). Fullilove had no personal familiarity with the documents, given that he didn't work at World Vision until after the CRRP project was completed; he reviewed but did not conduct the audit of the records; he did not ever review the individual documents "summarized" in the audit report; indeed, he had never even been to Liberia (Tr. 277-79, 290-92, 323). Over numerous foundation objections by both defendants, the trial court admitted records claimed to be from WV-Liberia's "commodities tracking system" (Tr. 253-65), even though the entirety of the foundation was Fullilove's conclusory statement that they were "maintained by World Vision in the ordinary course of business" (Tr. 255); in a branch office in which the witness did not work (Tr. 265), "prepared by World Vision employees … who had to

complete [them] as part of their job responsibilities" (Tr. 260), in a "time frame" he did not "precisely" know (Tr. 261-62). There was no additional foundation elicited about whether the records were created contemporaneously with the business activity; whether the employees had a duty to be honest; whether there was any integrity to (or knowledge of) the records' storage and maintenance; whether there was knowledge of the circumstances of their retrieval;[14] and whether the retrieval was comprehensive (Tr. 254-65). In short, the government did not demonstrate authenticity or trustworthiness in these papers.

Under Federal Rule of Evidence (FRE) 803(6), a business record must be (A) made at or near the time the information is transmitted, (B) by a person with knowledge and (C) a duty to be truthful, (D) kept and stored in the course of regularly conducted business activity, (E) as a regular practice of the business, (F) with a circumstantial guarantee of trustworthiness. FRE 803(6); *see also* 18 U.S.C. § 3505; E.J. Imwinkelried, Evidentiary Foundations (2d Ed.) 262 (1989). The government did no more than ask for the ultimate conclusion from its witness, perhaps

---

[14]   Specifically, Fullilove testified that "[i]t wasn't part of the [audit] report or the work papers who exactly gave us the records" (Tr. 294).

because the witness (a CFO from a different company,
located continents away from where the records were made)
*did not have* the knowledge necessary to lay this
foundation.

There is no indication, in this record, whether *all* of
the records created for the CRRP program were produced, or
which records (produced or missing) are the records that
were relied upon by CRS, or were submitted or maintained
for their review, if any.  Not a single witness testified
that CRS or USAID relied upon these particular records for
any purpose -- at best, a witness may have said that a form
or category of records was created for potential review,
but the court should not have allowed the government to
drop a massive load of papers without even the slightest
idea that these specific records were the ones set aside
for that purpose (even if only circumstantially, based on
location and maintenance), and that no other records
existed elsewhere (because the witness knew of a reliable
method of retrieval to ensure that production was
complete).  No such foundation was elicited, here.

Late in the trial, the court denied that anything had
been admitted as a business record, believing that it had
accepted the records because they were *false* (Tr. 1776-78).
The court refused to allow the <u>defense</u> to introduce a

derivative record that indisputably *had been submitted* to
CRS for its reliance (Tr. 1778-79), stating that with
respect to WV-Liberia documents it could not make "the
threshold determination of trustworthiness … without
something more having been presented … that would justify
the jury considering the document for the truth of the
information contained therein" (11/9 Tr. 21).

> I don't know if you're ever going to be
> able to satisfy me that narrative
> information in a report prepared by
> World Vision Liberia has a sufficient
> level of trustworthiness, that it's
> going to come in as a business record
> or as an exception under the residual
> hearsay examination.

(Tr. 1950).  But the government had been permitted to
publish the entire mass of unreliable documents, telling
the jury they were "business records" (Tr. 255, 260).

Furthermore, the government did not prove that
appellant directed the falsification of the documents.  At
worst, the evidence supported only allegations that he was
aware that others in the company were creating false
documents, cautioned them to be careful, and did nothing to
report the crime to authorities.  This falls far short of
elements of conspiracy.

To prove conspiracy under 18 U.S.C. § 371, the
government must prove "that the defendant entered into an

agreement with at least one other person to commit a
specific offense … as well as that the defendant knowingly
participated in the conspiracy with the intent to commit
the offense and that at least one overt act was committed
in furtherance of the conspiracy." *United States v.
Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996). While the
government need only prove that the conspirators agreed to
"the essential nature of the plan" and not "the details,"
and may do so with inferences from circumstantial evidence,
*id.*, the government must still show that an agreement was
formed, and that it "had as its objective a violation of
the law." *United States v. Lam Kwong-Wah*, 924 F.2d at
303.

Here, there is no evidence of agreement or of an
objective to violate the law. Mere knowledge that others
were creating false documents near his office did not
demonstrate that appellant agreed to commit a crime.[15]
There was no testimony of meetings, conversations, or
appellant's actions in concert with others that would
demonstrate conspiratorial agreement. "'While association
with conspirators is evidence of participation in the

---

[15]   Nor is it enough that appellant might have known that
work was done at his house, by employees of his company,
particularly where the employees admitted that there were
idle days (with no contract work to do), when they were
free to perform personal projects (Tr. 869).

conspiracy, something more is needed to show beyond a
reasonable doubt the deliberate, knowing, and specific
intent of the defendant to join the conspiracy.'"  *United
States v. Childress*, 58 F.3d 693, 708 (D.C. Cir. 1995),
*quoting United States v. Rengifo*, 858 F.2d 800, 808 (1st
Cir. 1988), *abrogated on other grounds by Kentucky v. King*,
131 S. Ct. 1849 (2011).

Moreover, the government must show "*purposeful* intent
-- or 'conscious desire to achieve [the] result'" of
breaking the law.  *United States v. Childress*, 58 F.3d at
707-08, *quoting United States v. Bailey*, 444 U.S. 394, 404
(1980).  Here, the charged intent was "to commit and cause
to be committed offenses against the United States [and] to
defraud the United States" (App. 54), but the funds and
commodities did not belong to the United States, and
appellant had no relationship with or responsibility to the
United States.

Appellant offers this analogy:  as everyone knows,
federal and state governments have Food Stamp programs
intended to provide food for indigent American families.
If a Maryland parent purchases food with Food Stamps, packs
a lunch for her child, and sends her off to school, the
bully who steals her lunch on the playground has not stolen
from (or defrauded) Maryland or the United States, even if

- 37 -

he knows that the family uses Food Stamps, *i.e.,* that the food was bought with credits provided by the government. The victim is not the government; the victim is the child. And as we shall see in the next Section, *infra*, the measure of the resulting "loss" is not the family's annual food budget or the federal government's contribution to Maryland's Food Stamps program -- the measure of "loss" is the value of the sandwich.

### IV.    The district court improperly calculated defendant's advisory Guidelines range    /

#### A.    Procedural Background

Under Guidelines §2B1.1, appellant's base offense level was 7, to which the district court added 26 levels based on two specific offense characteristics (16 levels under §2B1.1(b)(1)(I), for what it calculated as a $1.2 million "loss," and 4 levels under §2B1.1(b)(2)(C), for 250 "victims") and one adjustment (4 levels under §3B1.2(a), for "role in the offense"), for an overall adjusted offense level 33, and a sentencing range of 135 to 168 months. Using this adjusted range, the court sentenced appellant to 142 months.

**B.    Standard of Review**

This court reviews sentences under a "deferential abuse-of-discretion" standard, determining whether a sentence is "reasonable." *Gall v. United States*, 552 U.S. 38, 41 (2007).

**C.    Legal Analysis**

    **1.    The district court erred in applying USSG §2B1.1(b)(1)(I)**

Accepting the government's estimate of a "loss" amount of $1.2 million, the court applied specific offense characteristic §2B1.1(b)(1)(I), resulting in an increase of 16 levels.  Because this figure included the gross amount of funds donated to the CRRP program, and did not account for food and commodities actually delivered, and for the layers and layers of transfers and commissions taken by a vast array of independent entities, this figure was grossly inflated.

Although the original grant from USAID to CRS was $1.9 million, the CRS subgrant to WV-USA (after CRS took a percentage for administration) was $1.24 million (Tr. 387). WV-US took another 27% of the grant (Tr. 305), before assigning responsibility to WV-International (not WV-Liberia, which had no contract with or responsibility to

- 39 -

the CRS or any agency of the United States), which would
bring WV-International's total responsibility to $905,200.[16]
But the most significant concession made by the United
States, prior to sentencing, was its representation to the
trial court, contained in a letter (App. 255) that the
court considered (4/26/11 Tr. 2), that the "258 towns
received only 91 percent of the food that the defendants'
program purportedly distributed to them." *Id*. Ninety-one
percent performance suggests a loss of only $81,468.[17]
Moreover, the jury's verdict did *not* establish a diversion
of food: the verdict demonstrates that the only conduct
unanimously found involved work done at personal residences
and falsification of documents

The fact that the behemoth companies elected to settle
their responsibilities to one another with contractually-
mandated refund payments does not settle the issue of
"loss" under the USSG. Here, the district court should
have endeavored to calculate a more reasonable loss figure,

---

[16]   Loss between $400,000 and $1 million results in only a
14-level increase under USSG §2B1.1(b)(1)(H); therefore,
correction for this specific characteristic alone, would
lower appellant's range to 108 to 135 months.

[17]   Loss between $70,000 and $120,000 results in only an 8-
level increase, under USSG §2B1.1(b)(1)(E); therefore,
correction to reflect this loss figure alone, would lover
appellant's range to 57-71 months.

that more fully reflected actual loss, this appellant's limited responsibility and, at a minimum, the government's concession that 91% of the food was distributed.

### 2.  The district court erred in applying USSG §2B1.1(b)(2)(C)

Although not included in the original draft of the presentence report prepared by the Department of Probation, the district court accepted the government's invitation to enhance the defendant's sentence by six (6) levels, under §2B1.1(b)(2)(C), based in the government's argument that there were more than 250 "victims" (4/26/11 Tr. 33). Although the trial court properly evaluated a category of individuals who had suffered no "pecuniary loss," as required under the Guidelines,[18] the ultimate application of this adjustment is completely unsupportable.

"Number of victims" was never submitted to the jury; indeed, other than a description of the program-design (Tr. 578), no percipient witness ever testified that an individual who provided labor was denied food.  The government presented *at sentencing only* letters from

---

[18]   The trial court rejected the theory that any individual who could potentially have received food had a vested interest sufficient to render him a victim suffering loss (4/26/11 Tr. 31).  It accepted the government's allegation, however, that individuals had provided labor for food, and had not received the food payment (*id*. at 33).

individuals worked and distributed food (4/26/11 Tr. 30)

and three letters only, which contained references to "105

people," "120 persons," and "150 persons" who performed

"roadside brushing" services and did not receive food

payments (*id.* at 30-31).

> As we noted in [*Apprendi v. New Jersey*,
> 530 U.S. 466, 477 (2000)]: "[T]he
> historical foundation for our
> recognition of these principles extends
> down centuries into the common law.
> '[T]o guard against a spirit of
> oppression and tyranny on the part of
> rulers,' and 'as the great bulwark of
> [our] civil and political liberties,'
> trial by jury has been understood to
> require that '*the truth of every
> accusation,* whether preferred in the
> shape of indictment, information, or
> appeal, should afterwards be confirmed
> by the unanimous suffrage of twelve of
> [the defendant's] equals and
> neighbours. … '"

*United States v. Booker*, 543 U.S. 220, 239 (2005) (emphasis

in original; further internal citations omitted).  None of

the individuals whose unsworn letters the government

presented, testified at trial; none of the witnesses who

were presented at trial were asked about work performed

without food distribution.  The trial court should not have

considered this allegation at sentencing, particularly

where the effect on the USSG calculation was severe.[19]

---

[19]   Correction for this specific characteristic alone, would
lower appellant's adjusted range to 70 to 87 months.

### 3.    The district court erred in applying USSG §3B1.2(a)

The trial court applied a four (4) level increase for appellant's "role in the offense," under USSG § 3B1.2(a), finding that he was a leader or organizer, based on appellant's "position of hierarchy in this organization" and the fact that he was an "active participant in the fraudulent behavior that was being perpetrated" (4/26/11 Tr. 24-25). This, too, was unreasonable.

Although appellant may have had a managerial role in WV-Liberia, that does not mean he had a managerial role in the offenses. Indeed, the evidence is to the contrary. As set forth in Section III, above, it is clear that appellant played, if anything, a minor role in this offense, and in fact, he does not concede that he played any role, whatsoever. The alleged co-conspirators, Thomas Parker and Joe Bondo gave all of the direction to employees regarding documents and construction work. It was unreasonable for the trial court to conclude, merely based on appellant's position with WV-Liberia, that he was an "organizer of leader" of the fraudulent activity.[20]

---

[20]    Correction for this adjustment alone, would lower appellant's adjusted range to 87 to 108 months.

- 43 -

The combination of enhancements and adjustment applied in this case grossly inflated the trial court's calculation under the USSG by a total of eighteen levels, from a range of 18-24 months (an amount of time that, incidentally, he already has served) to a range of 135-168 months. Appellant believes that the calculation was unreasonable, and at a minimum, his case should be remanded for resentencing.

## CONCLUSION

For all of the reasons set forth herein, appellant respectfully requests that his case be reversed and dismissed with prejudice, or, at a minimum, that it be remanded to the district court for re-sentencing.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel for Appellant hereby certifies that this Brief complies with the type-volume limitation of Rule 32(a)(7)(B).  As measured by the word processing system used to prepare this Brief, there are 11,273 words in this Brief.

_____/s/_____

BARBARA KITTAY
Counsel for Appellant
(Appointed by the Court)
D.C. Bar Number 414216
P.O. Box 2458
Kensington, Maryland  20891
(301) 468-1817
bkittay@verizon.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have filed the foregoing Brief for Appellant with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on July 23, 2012.

The following are registered CM/ECF users and will be served by the appellate CM/EC system:  Elizabeth Trosman, Acting Chief, Appellate Division, U.S. Attorney's Office for the District of Columbia, counsel for appellee; and Sandra Roland, Assistant Federal Public Defender, counsel for the consolidated defendant, Joe Bondo, and will be provided with paper copies of the brief and appendix, by first class, U.S. Mail, this 23rd day of July, 2012.

_____/s/_____
Barbara E. Kittay